IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

GENTRY MACHINE WORKS, INC.,          *

    Plaintiff,                        *

vs.                                  *

                                             CASE NO: 4:06-CV-105 (CDL)

                                  *

HARLEYSVILLE MUTUAL INSURANCE
COMPANY, HARLEYSVILLE-ATLANTIC          *
INSURANCE COMPANY, HARLEYSVILLE
INSURANCE COMPANY, and                  *
HARLEYSVILLE GROUP, INC.

                                  *

    Defendants.                       *

_____        *

O R D E R

    In this action, Plaintiff Gentry Machine Works, Inc. ("GMW")
seeks damages from Defendants (collectively "Harleysville") based
upon Harleysville's denial of GMW's claim for liability insurance
coverage. Although GMW had commercial general liability ("CGL")
insurance coverage through Harleysville, Harleysville denied GMW's
claims for liability coverage based upon several exclusions in the
GMW insurance policy (the "Policy").

    GMW's customer, Cleaver-Brooks, Inc., made claims against GMW
for property damages related to a defective product GMW manufactured
for Cleaver-Brooks (the "underlying claims"). GMW contends that the
Policy requires Harleysville to reimburse GMW for paying Cleaver-
Brooks to resolve the underlying claims because the underlying claims
constitute "property damage" covered under the Policy. Harleysville
contends that as a matter of law, the "property damage" suffered by

1

GMW's customer is not covered under the Policy, and hence GMW is not entitled to recover its losses. Both GMW and Harleysville have filed motions for summary judgment. For the following reasons, the Court finds that the Policy does not apply to some of the "property damage" for which GMW seeks reimbursement, and therefore, summary judgment should be granted in favor of Harleysville as to some of GMW's claims for insurance coverage. The Court also finds that genuine issues of material fact exist as to whether other types of "property damage" are covered under the Policy, and therefore, summary judgment is not appropriate as to those claims. Accordingly, as more specifically described below, Defendant's motion for summary judgment (Doc. 27) is granted in part and denied in part and Plaintiff's motion for summary judgment (Doc. 16) is denied.[1]

---

[1]Defendants also filed a Motion to Exclude Certain Documents from the Record (Doc. 38). That motion is denied. Harleysville contends that GMW has not sufficiently authenticated certain documents received from a subpoena issued to GMW's customer, Cleaver-Brooks. "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Testimony of a witness with knowledge "that a matter is what it is claimed to be" is one way to authenticate such documents. Fed. R. Evid. 901(b)(1). In response to Harleysville's motion, GMW filed the affidavit of John Tornetta, the manager of technical services for Cleaver-Brooks. (Tornetta Aff. ¶ 3, Nov. 16, 2007.) Tornetta averred that he was familiar with the "pedestal situation" that is the subject of this lawsuit, that he maintained custody of the records relating thereto, that "[t]he documents accurately reflect the transactions to which they refer[,]" and that the documents forwarded to GMW were "true and complete." (*Id.* ¶¶ 4-7.) The Court finds that this affidavit is sufficient to authenticate these documents and therefore denies Harleysville's motion to exclude.

## I.  The Pedestal Situation

This dispute arises from machine and metal fabrication work that GMW performed for its client Cleaver-Brooks, Inc., a company that constructs commercial boilers.  GMW fabricated parts for Cleaver-Brooks' boilers, including a part known as a "pedestal."  These pedestals are welded to the top of the boiler and serve as the main rear hinge for the rear boiler doors.  The pedestal also secures to the boiler a part known as a "davit arm," which allows the rear boiler door to swing open so the boilers can be routinely cleaned, maintained, and inspected.

In July 2004, Cleaver-Brooks advised GMW that a weld on one of the pedestals fabricated by GMW had broken.  GMW investigated the incident and realized that one of its employees had missed an internal weld while fabricating the pedestal.  This missing internal weld caused the external weld of the pedestal seam to crack.  To date, the external welds on fourteen boilers have failed due to a missed internal weld.  In addition to making the boilers inoperable, the failure of these welds also creates safety concerns because a weakened pedestal cannot support the weight of the rear boiler door.  On at least one occasion, a boiler door separated from the boiler itself and fell to the floor.  The failure of the welds also prevents the boiler doors from sealing properly, thus allowing potentially harmful gases to escape from the boilers.

Cleaver-Brooks inspected 723 boilers that contained GMW-fabricated pedestals; 236 of these boilers required repair due to a completely missing internal weld on the pedestal. Cleaver-Brooks invoiced GMW for its inspection and repair costs, and GMW paid each of these invoices.[2]

GMW notified its liability insurance carrier, Harleysville, of the underlying claims and its resulting claim for insurance coverage in July 2004. Harleysville acknowledged GMW's claim on July 27, 2004 in a reservation of rights letter which also expressed Harleysville's "concerns about coverage." (Ex. A to Summers Aff., Oct. 12, 2007.) On September 29, 2004, Harleysville concluded its investigation of the underlying claims and denied coverage. (Ex. 3 to Young Dep., May 18, 2007.)

Between December of 2004 and March of 2005, GMW's attorney and Harleysville exchanged communications regarding whether the underlying claims resulted in "property damage" within the meaning of the Policy. In November of 2005, GMW made a written demand for $36,386.24 on Harleysville in accordance with O.C.G.A. § 33-4-6. This sum represented the expenses incurred by Cleaver-Brooks to repair the pedestals and boilers through that date.[3] On April 26, 2006, GMW again made a written demand pursuant to O.C.G.A. § 33-4-6,

---

[2]Cleaver-Brooks actually offset its damages against amounts that it otherwise owed to GMW.

[3]On December 30, 2005, Harleysville offered to settle with Cleaver-Brooks, but the offer was rescinded on January 5, 2006. (Exs. F & G to First Am. Compl.)

4

this time for $241,030.45, representing the amount of damages incurred through that date. Harleysville again denied coverage, and GMW filed the instant action in July 2006.

Harleysville asserts that it has no duty to reimburse GMW for the damages it paid to Cleaver-Brooks because those losses are specifically excluded under the following Policy exclusions: (1) the "your work" exclusion; (2) the "your product" exclusion; (3) the "impaired property" exclusion; and (4) the "recall" exclusion. GMW responds that these exclusions do not apply to the circumstances of this case.

## II. The Policy and Its Exclusions

The Policy provides that Harleysville "will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." (Ex. 1 to Mem. in Supp. of Defs.' Mot. for Summ. J. at 1 [hereinafter, "Policy"].) "Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property" as well as "[l]oss of use of tangible property that is not physically injured." (*Id.* at 15.) The Policy only applies to "property damage" that "is caused by an 'occurrence,'" which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[4] (*Id.* at 1, 14.)

_____

[4]Georgia courts recognize that unintended faulty workmanship can constitute an "occurrence" under the standard language contained in a CGL policy. *See SawHorse, Inc. v. S. Guar. Ins. Co. of Ga.*, 269 Ga. App. 493, 499, 604 S.E.2d 541, 546 (2004); *see also Glens Falls Ins. Co. v. Donmac*

The Policy contains several exclusions upon which Harleysville relies in its denial of coverage. First, the Policy contains "your work" and "your property" exclusions, which in relevant part exclude from coverage "'[p]roperty damage' to 'your product' arising out of it or any part of it" and "'[p]roperty damage to 'your work' arising out of it or any part of it." (Policy at 5.) The Policy also contains an "impaired property" exclusion, which excludes from coverage "'[p]roperty damage to 'impaired property' or property that has not been physically injured, arising out of . . . [a] defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work'[.]" (*Id.*) Finally, the Policy contains a "recall" exclusion, which bars coverage for "[d]amages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of" the insured's product, work, or impaired property when these items are "withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it." (*Id.*)

As discussed below, the Court finds that the Policy excludes coverage as a matter of law for (1) any "property damage," including loss of use and physical injury, to the pedestals themselves; (2) costs to inspect any actually or potentially defective pedestal; (3)

---

*Golf Shaping Co.*, 203 Ga. App. 508, 509, 417 S.E.2d 197, 198-99 (1992).

any physical injury to any boiler or component that meets the Policy definition of "impaired property"; (4) any loss of use of any property that was not physically injured; and (5) any damages to the boilers or their component parts directly caused by the repairs to the pedestals. Because the Policy does not cover these types of losses, summary judgment in favor of Harleysville is appropriate to the extent GMW seeks reimbursement for them.

The Court, however, finds that the Policy applies to any "property damage" to the boilers and their component parts, other than the pedestals, directly caused by pedestal failure but unrelated to pedestal repair. The Court also finds that genuine issues of material fact remain as to the existence, nature, and extent of these damages. Moreover, the Court finds that genuine issues of material fact exist as to whether there was a loss of use of any "impaired property" that arose from a "sudden and accidental physical injury" to the pedestal after it had been put to its intended use and whether any "impaired property" was excluded from use so as to implicate the "recall" exclusion. Because the resolution of these issues will affect the determination of coverage, summary judgment is not appropriate as to those categories of potential losses.

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The moving party has the burden of showing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). This burden can be met by showing that the non-moving party will be unable to "establish the existence of an element essential to [the non-moving party's] case, and on which [the non-moving party] will bear the burden of proof at trial." *Id.* at 322.

Once the moving party has met its burden, the burden shifts to the non-moving party to show that there *is* a genuine issue of material fact. *Id.* at 324. A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a genuine issue if the evidence would allow a reasonable jury to find for the non-moving party. *Id.* In other words, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

In determining if the parties have met their respective burdens, the Court resolves "all reasonable doubts about the facts in favor of the non-movant, and draw[s] all justifiable inferences in his . . . favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotation marks and citation omitted). Additionally, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau*, 835

F.2d 855, 856 (11th Cir. 1988) (internal quotation marks and citation omitted).

DISCUSSION

In a diversity case involving the interpretation of an insurance contract, "the Court is bound by the applicable state law governing the contract, in this case Georgia law." *See, e.g., Giddens v. Equitable Life Assurance Soc'y of U.S.*, 445 F.3d 1286, 1297 n.9 (11th Cir. 2006). In Georgia, construction of an insurance contract is a question of law for the Court, O.C.G.A. § 13-2-1, and "[e]very insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any rider, endorsement, or application made a part of the policy," O.C.G.A. § 33-24-16. In interpreting the terms and conditions of a policy, Georgia law requires an application of "the rules of construction applicable to other contracts, and words in the policy must be given their usual and common signification and customary meaning." *Collier v. State Farm Mut. Auto. Ins. Co.*, 249 Ga. App. 865, 866, 549 S.E.2d 810, 811 (2001) (internal quotation marks and citations omitted).

When the language of an insurance policy is unambiguous, Georgia courts refuse to expand the rights of the parties to an insurance policy beyond the plain terms of the policy. *See Giddens*, 445 F.3d at 1297 (holding that a policy will be enforced as written "[w]here the language of the contract is unambiguous and only one reasonable interpretation is possible"). When some ambiguity exists,

9

Georgia law requires a policy to be "construed in the light most favorable to the insured and against the insurer." *Id.* Even when a policy contains some ambiguity, however, "no jury question is presented unless an ambiguity remains after application of applicable rules of construction." *Alley v. Great Am. Ins. Co.*, 160 Ga. App. 597, 599, 287 S.E.2d 613, 616 (1981). In resolving such ambiguities, Georgia courts have held that "[t]he cardinal rule of construction is to ascertain the intention of the parties." *See, e.g., id.* (internal quotation marks and citation omitted). "'[T]he test is not what the insurer intended its words to mean, but rather what a reasonable person in the insured's position would understand them to mean.'" *Giddens*, 445 F.3d at 1297 (quoting *W. Pac. Mut. Ins. Co. v. Davies*, 267 Ga. App. 675, 680, 601 S.E.2d 363, 368-69 (2004)). Applying these principles, the Court finds that some of the damages incurred by Cleaver-Brooks and paid by GMW are clearly excluded from coverage under the Policy. The Court also finds, however, that genuine issues of material fact exist as to whether other such losses are covered.

## I. Application of the Policy's Coverage Exclusions

Harleysville contends that it is under no duty to reimburse GMW because the Policy's "business risk" exclusions bar coverage for any "property damage" resulting from the underlying claims. More specifically, Harleysville argues that the Policy does not apply to (1) costs related to the repair and replacement of GMW pedestals; (2) costs for repair and replacement of items that had to be removed to access the pedestals; (3) any "loss of use" of the boilers containing

10

the defective pedestals; and (4) costs related to inspecting the potentially defective pedestals. GMW maintains that the Policy provides coverage for (1) "property damage" to parts of boilers other than the pedestals; (2) loss of use of boilers that were not physically injured due to the dangerous condition created by the missing pedestal welds; and (3) all consequential damages relating to "property damage" to the boilers.

The "your work", "your product", "impaired property", and "recall" exclusions are often characterized as "business risk" exclusions. *See, e.g., Sapp v. State Farm Fire & Cas. Co.*, 226 Ga. App. 200, 202-03, 486 S.E.2d 71, 73-74 (1997). The purpose of the "business risk" exclusions is to ensure that liability for faulty or defective workmanship is properly allocated between the insurer and the insured, and "[t]he principle behind such exclusions is based on the distinction made between two kinds of risk incurred by a contractor." *Glens Falls Ins. Co. v. Donmac Golf Shaping Co.*, 203 Ga. App. 508, 511, 417 S.E.2d 197, 200 (1992). "The first is the business risk borne by the contractor to replace or repair defective work to make the building project conform to the agreed contractual requirements"; this is the type of risk excluded from coverage under a typical CGL policy. *Id.* "The second is the risk that the defective or faulty workmanship will cause injury to people or damage to other property. Because of the potentially limitless liability associated with this risk, it is the type for which CGL coverage is contemplated." *Id.* Put differently,

> [w]hile it may be true that the same neglectful
> craftsmanship can be the cause of both a business expense
> of repair and a loss represented by damage to persons and
> property, the two consequences are vastly different in
> relation to sharing the cost of such risks as a matter of
> insurance underwriting. The risk intended to be insured is
> the possibility that the goods, products or work of the
> insured, once relinquished or completed, will cause bodily
> injury or *damage to property other than to the product or
> completed work itself,* and for which the insured may be
> found liable. The insured, as a source of goods or
> services, may be liable as a matter of contract law to make
> good on products or work which is defective or otherwise
> unsuitable because it is lacking in some capacity. *This
> may even extend to an obligation to completely replace or
> rebuild the deficient product or work. This liability,
> however, is not what the coverages in question are designed
> to protect against.*

*Sapp*, 226 Ga. App. at 204, 486 S.E.2d at 75; *see also Elrod's Custom*

*Drapery Workshop, Inc. v. Cincinnati Ins. Co.*, 187 Ga. App. 670, 670,

371 S.E.2d 144, 145 (1988) (noting that Georgia follows the majority

position in holding that the "purpose of this comprehensive liability

insurance coverage is to provide protection for personal injury or

for property damage caused by the completed product, but not for the

replacement and repair of that product" (internal quotation marks and

citation omitted)).

The Court analyzes whether these exclusions apply to the

underlying claims asserted by Cleaver-Brooks against GMW. Those

underlying claims can be divided into two broad categories. The

first category includes "property damage," including the loss of use

of and physical injury to the pedestals themselves. This category

also includes claims for the inspection of and access to the

pedestals themselves. The second broad category of claims includes

12

"property damage" to the boilers and their components other than the pedestals themselves. The Court analyzes these categories of underlying claims separately under the applicable exclusions.

A. "Property Damage" to Pedestals Themselves

In this case, the "business risk" exclusions preclude coverage for any "property damage" to the pedestals themselves. The Policy does not apply to "'[p]roperty damage' to 'your product' arising out of it or any part of it." (Policy at 5.) Similarly, the Policy is inapplicable to "'[p]roperty damage' to 'your work' arising out of it or any part of it" when the work has been completed and the injury occurs away from premises owned or rented by the insured. (*Id.* at 1, 5, 15.) "Property damage" includes both "[p]hysical injury to tangible property, including all resulting loss of use of that property" and "[l]oss of use of tangible property that is not physically injured." (*Id.* at 15.)

The parties appear to agree that GMW's "product" consists of the pedestals alone. (*See, e.g.,* Young Dep. 38:20-24.) Thus, the plain terms of the Policy exclude coverage for any "property damage" to the pedestals themselves. *See, e.g., Gary L. Shaw Builders, Inc. v. State Farm Mut. Ins. Co.*, 182 Ga. App. 220, 221-22, 355 S.E.2d 130, 132 (1987) (affirming trial court's determination that nearly identical "your work" and "your product" exclusions were "clear and unambiguous" and that "[t]he comprehensive general liability policy is not intended to insure against defective workmanship causing

13

damage to the work product itself" (internal quotation marks omitted)).

In addition, under Georgia law, any costs incurred by Cleaver-Brooks to inspect and access the damaged pedestals are excluded from coverage under the Policy. In *Canal Indemnity Co. v. Blackshear Farmers Tobacco*, the Georgia Court of Appeals recognized that Georgia follows the majority view regarding the "your work" and "your product" exclusions, concluding that those provisions "exclude[] property damage for replacement and repair of a defective product[.]" 227 Ga. App. 637, 639, 490 S.E.2d 129, 131-32 (1997); *see also McDonald Constr. Co., Inc. v. Bituminous Cas. Corp.*, 279 Ga. App. 757, 764, 632 S.E.2d 420, 425 (2006) (costs to remove defective flooring and cost of testing materials to determine the cause of the defect considered costs associated with repairing and replacing insured's faulty work, and therefore not covered under CGL policy); *Sapp*, 226 Ga. App. at 204, 486 S.E.2d at 75 ("Any damages to the house during the removal of the [defective product] and the restoration of the house to the condition it was prior to [the contractor's] work were merely incidental to the [homeowner's] claimed damages that [the contractor] negligently performed the services for which the [homeowner] contracted.").

Finally, the Policy does not cover any expenses associated with the preventative inspection of over seven hundred potentially defective pedestals in this case. In the absence of any evidence that those pedestals caused personal injury or property damage, such

14

inspection costs are not covered under a CGL policy containing the standard "business risk" exclusions. *See, e.g., McDonald Constr. Co.*, 279 Ga. App. at 762-63, 632 S.E.2d at 424 (finding that a CGL policy was not designed to "cover [the insured's] costs of complying with a known, pre-existing contractual obligation which, if not addressed, might potentially expose the company to tort liability sometime in the future"); *see also Sapp*, 226 Ga. App. at 203-04, 486 S.E.2d at 74-75.

In sum, the Court concludes that the Policy does not cover any loss of use or physical injury sustained by the pedestals themselves. Specifically, the costs incurred by Cleaver-Brooks to inspect, repair, and replace the defective pedestals as well as the preventative inspection of the non-defective pedestals are not covered under the Policy. Because the Policy therefore creates no legal obligation requiring Harleysville to indemnify GMW for this "property damage," Harleysville is entitled to summary judgment to the extent GMW seeks reimbursement for these losses.

B.    "Property Damage" to Other Property

GMW maintains that the defective pedestals also caused "property damage" to the boilers and their component parts and that the Policy would apply to such damages. It is well-established in Georgia that "[f]or there to be coverage under a CGL policy for faulty workmanship, there would have to be damage to property other than the work itself and the insured's liability for such damage would have to arise from negligence, not breach of contract." *McDonald Constr.*

15

*Co.*, 279 Ga. App. at 761-62, 632 S.E.2d at 423. Although Harleysville appears to agree with this general proposition, it argues that in this case, no admissible record evidence indicates that any property other than the pedestals themselves were damaged.

The present record, however, demonstrates that genuine issues of material fact exist as to whether component parts of the boilers—including at least one rear boiler door and portions of the davit arm assembly—were damaged when the pedestals themselves failed. (*See, e.g.*, Miller Dep. 75:3-76:6, July 30, 2007 [hereinafter Miller Dep. I]; Cipriani Dep. 50:1-11; 96:15-97:11, Oct. 4, 2007.) For example, one boiler door separated completely from the pedestal assembly and fell to the floor. (Ex. A to Pl.'s Reply to Defs.' Resp. to Pl.'s Mot. for Summ. J. at 10. [hereinafter Pl.'s Reply]) In that case, the bearing assembly and door were replaced. (*Id.*; Ex. 6 to Lowe Dep.) The record also indicates that in another case, the pins and bearings on the davit arm needed to be replaced after they bore the weight of the rear boiler door because the pedestal had cracked. (Cipriani Dep. 96:15-97:5; *see also* Ex. A. to Pl.'s Reply at 27.) In any case where "property damage" occurred to any part of the boiler other than the pedestal itself, the "your work" and "your product" exclusions would not bar coverage. The Court must therefore determine whether the remaining "business risk" exclusions exclude coverage for such claims. This analysis only applies to those claims that are not excluded under the "your product" and/or "your work"

16

exclusions as explained previously. Therefore, it is restricted to an analysis of claims for damages to the boilers and component parts *other than the pedestals* that were caused by the failure of the pedestals and are unrelated to the repair or replacement of the pedestals.

### 1. "Property Damage" to "Impaired Property"

Harleysville argues that the "impaired property" exclusion operates to defeat coverage for some of the remaining claimed "property damage" in this case. The "impaired property" exclusion excludes "'[p]roperty damage' to 'impaired property' or property that has not been physically injured, arising out of . . . [a] defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work.'" (Policy at 5.) "Impaired property" is defined as "tangible property, other than 'your product' or 'your work' that cannot be used or is less useful because . . . [i]t incorporates 'your product' or 'your work', that is known or thought to be defective, deficient, inadequate or dangerous[,]" but only "if such property can be restored to use by . . . [t]he repair, replacement, adjustment or removal of 'your product' or 'your work[.]'" (*Id*. at 13.)

The majority of the boilers in this case clearly meet the Policy definition of "impaired property": they are tangible property that incorporate GMW's defective product and/or defective work, and most of the boilers were restored to use by simply repairing the defective

17

pedestals. The "impaired property" provision thus excludes from coverage any physical injury to any boiler where the only necessary repair was to the pedestal itself. In addition, the "impaired property" exclusion bars coverage for "'[p]roperty damage' to . . . property that has not been physically injured[] arising out of . . . [a] defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work[.]'" (Policy at 5.) The provision would thus exclude coverage of the loss of use of any boilers that were inspected but found undamaged.

However, the "impaired property exclusion" is inapplicable when there is a "loss of use of other property arising out of a sudden and accidental physical injury to 'your product' or 'your work' after it has been put to its intended use." (Policy at 5.) Put differently, the "impaired property" exclusion will defeat coverage unless GMW can demonstrate that the claimed loss of use arose out of a sudden and accidental physical injury to the subject pedestals after they had been incorporated into the boilers. The parties have directed the Court to no evidence that would allow it to determine whether the pedestal weld failures were "sudden." *See, e.g., Corder v. William W. Smith Excavating Co.*, 210 W. Va. 110, 118 (2001) (determining that the record contained insufficient evidence to permit the court to decide, as a matter of law, that a collapsed sewer line constituted a "sudden and accidental physical injury" that resulted in loss of use damages). Accordingly, genuine issues of material fact remain as

18

to whether the loss of use of any boiler that meets the definition of "impaired property" is covered under the Policy.[5]

In sum, the "impaired property" exclusion operates to defeat coverage for physical injury to any boilers that meet the definition of "impaired property," and thus Harleysville is entitled to summary judgment to the extent GMW seeks reimbursement for these damages. Because genuine issues of material fact exist as to whether any claimed loss of use of the boilers arose from a sudden and accidental physical injury, however, Harleysville's motion for summary judgment must be denied as to those claims for reimbursement.

---

[5]Even if sufficient evidence is presented that the pedestal failures constitute a "sudden and accidental physical injury," the Policy's "recall" exclusion may still operate to defeat coverage for claims of loss of use of "impaired property." The "recall" provision excludes "[d]amages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of" the insured's product, work, or impaired property, but only if "such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it." (Policy at 5.) Evidence exists that the boilers were never withdrawn or recalled from the *market*. (*See, e.g.*, Clayton Dep. 10:22-11:3, May 18, 2007; Young Dep. 45:15-22.) It is unclear, however, whether Cleaver-Brooks' customers withdrew the boilers from *use* once they realized the equipment was potentially defective. Based on the present record, however, a reasonable juror could surmise that the pedestals or boilers were "withdrawn . . . from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition." (Policy at 5.)

While genuine issues of fact may exist as to the applicability of the "recall" exclusion, any "property damage" to the pedestal itself is already excluded by the "your work" and/or "your product" exclusions. Thus, under the facts of this case, the "recall" exclusion could only apply to boilers that meet the definition of "impaired property" but are not excluded by that provision. (*See* Policy at 5.) In other words, for the "recall" exclusion to apply, repair or replacement of the pedestal must have been sufficient to restore the boiler to use, and the claimed losses must fall within the "sudden and accidental physical injury" exception to the exclusion. (*Id*. at 5, 13.)

19

2. *"Property Damage" to Property That Is Not "Impaired"*

GMW also claims that it is entitled to reimbursement for "property damage" to boilers that fail to meet the definition of "impaired property." As previously discussed, there is record evidence to support GMW's contention that several of the boilers suffered damage to component parts other than the pedestals themselves. *(See, e.g.*, Miller Dep. I 75:3-76:6; Cipriani Dep. 50:1-11; 96:15-97:11.) Because GMW's repair, replacement, adjustment, or removal of its defective pedestals cannot restore these damaged boilers to use, these boilers fail to meet the Policy definition of "impaired property." The "impaired property" exclusion therefore does not apply to this type of "property damage." These claims include the loss of use of or any physical injury to the boiler itself or its component parts directly caused by pedestal failure.

Moreover, this type of "property damage" would not be excluded from coverage under the "your product" or "your work" exclusions because the damage occurred to parts of the boilers other than the pedestals themselves. *See, e.g., Canal Indem. Co.*, 227 Ga. App. at 639-40, 490 S.E.2d at 132 (finding that where the insured's negligent "work" on a roof directly caused the remaining portions of the roof to sustain damage, such damage was covered under CGL policy). Accordingly, "property damage" to the boilers and their component parts, apart from any damages incurred in repairing and replacing the defective pedestals, is not excluded from coverage under the "your

20

work," "your product," or "impaired property" exclusions. *See, e.g.*, *Controlled Blasting, Inc. v. Ranger Ins. Co.*, 225 Ga. App. 373, 375, 484 S.E.2d 47, 49 (1997) ("The purpose of this comprehensive liability insurance coverage is to provide protection for . . . property damage caused by the completed product . . . ." (internal quotation marks and citation omitted)). However, the Court finds that genuine issues of material fact remain as to the existence, nature, and extent of any damage to the boilers and their components. Accordingly, Harleysville's motion for summary judgment is denied as to these potential losses.[6]

### C. Summary of the Court's Coverage Rulings

In sum, the Court finds the following categories of losses are excluded from coverage by the "business risk" exclusions of the Policy: (1) any "property damage," including loss of use and physical injury, to the pedestals themselves; (2) costs to inspect any actually or potentially defective pedestal; (3) any physical injury

---

[6]The Court reiterates that the Policy does *not* apply to damages to the boiler or its components directly caused by repairs to the pedestals. For example, the record contains evidence that in order to access some of the cracked pedestals for repair, workers had to remove the outer "skin" of the boiler, insulation, and external structures, such as catwalks. These parts may have been damaged in the process of their removal, and they often had to be replaced entirely after the repair to the pedestals was complete. (*See, e.g.*, Defs.' Ex. 15 to Miller Dep., Sept. 25, 2007 at 4, 6 [hereinafter Miller Dep. II].) Although these boilers sustained damage to component parts other than the pedestals themselves, no coverage exists for these damages as they were not caused directly by pedestal failure but rather were incurred during the repair and/or replacement of the faulty pedestals. *See, e.g., Sapp*, 226 Ga. App. at 204, 486 S.E.2d at 75 (finding coverage barred by CGL policy because "all [the plaintiff's] claimed damages relate directly to the cost of repairing or replacing the alleged negligent work of defendants").

to any boiler or component that meets the Policy definition of "impaired property"; (4) any loss of use of any property that was not physically injured; and (5) any damages to the boilers or their component parts directly caused by the repairs to the pedestals. Because the Policy does not apply to these types of losses, summary judgment in favor of Harleysville is appropriate to the extent GMW seeks reimbursement for them.

The Court, however, finds that the Policy does not exclude coverage for any "property damage" to the boilers and their component parts, other than the pedestals, directly caused by pedestal failure but unrelated to pedestal repair. The Court also finds that genuine issues of material fact remain as to the existence, nature, and extent of these damages. Moreover, the Court finds that genuine issues of material fact exist as to whether there was a loss of use of any "impaired property" that arose from a "sudden and accidental physical injury" to the pedestal after it had been put to its intended use and whether any "impaired property" was withdrawn from use so as to implicate the "recall" exclusion. Because the resolution of these issues will affect the determination of coverage, summary judgment is not appropriate as to those categories of potential losses.

## II. GMW's Bad Faith Claim

In addition to its claims for compensatory damages, GMW seeks penalties and attorney fees pursuant to O.C.G.A. § 33-4-6 based upon

Harleysville's alleged bad faith denial of insurance coverage. "To support a cause of action under O.C.G.A. § 33-4-6, the insured bears the burden of proving that the refusal to pay the claim was made in bad faith." *Atl. Title Ins. Co. v. Aegis Funding Corp.*, 287 Ga. App. 392, 393, 651 S.E.2d 507, 508 (2007). "Although the question of good or bad faith is ordinarily for the jury, the insurer is entitled to judgment as a matter of law if it has reasonable grounds to contest the claim or the question of liability is close." *Id.* The Court's foregoing analysis regarding the coverage issues in this case makes it clear that Harleysville had reasonable grounds to contest the nature and extent of GMW's claims in this case. Accordingly, Harleysville is entitled to summary judgment on GMW's bad faith claim.

CONCLUSION

For the reasons stated herein, the Court grants in part and denies in part Defendants' Motion for Summary Judgment (Doc. 27) and denies Plaintiff's Motion for Summary Judgment (Doc. 16). The Court also denies Defendants' Motion to Exclude (Doc. 38).


IT IS SO ORDERED, this 30th day of June, 2008.



                                    S/Clay D. Land
                                    _____

                                         CLAY D. LAND
                                    UNITED STATES DISTRICT JUDGE